**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Elvia M. Lopez ((State Bar No. 331986)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          elopez@bursor.com
          slitteral@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY FOUNTAIN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>THE PROCTER & GAMBLE COMPANY and THIS IS L. INC.,<br><br>                    Defendants. | Case No. 2:22-cv-01549-TLN-AC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Ashley Fountain ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against The Procter & Gamble Company and This is L. Inc. (referred to collectively as, "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiff brings this class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendants' tampons sold under the brand name "L. Organic" (referred to as the "Products").[1]

2.     The demand for clean period-care products has grown rapidly, as more women prefer clean alternatives that are organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.  This consumer preference is well-grounded, as tampons come in direct contact with one of the most sensitive and absorptive skin on a woman's body.  Vaginal exposure to substances raises important health concerns due to the rapid nature of vaginal absorption.

3.     To capitalize on consumer demand and expand its period-care portfolio, Defendant Procter & Gamble ("P&G") acquired Defendant This is L, a "leading natural feminine care brand" that purportedly "provides thoughtfully designed products made with organic cotton."[2]  The L. Organic brand exploded in growth because of its widespread marketing campaign positioning the Products as a clean period-care alternative that is organic, natural, and free of synthetic ingredients and harmful substances.

4.     Indeed, Defendants market the Products as a clean period-care alternative that is organic, natural, contain neither synthetic ingredients nor harmful substances that raise risk of harm (hereinafter referred to as "Clean Representations").  For example, Defendants claim that the "L.

---

[1] Discovery may reveal that additional of Defendants' products are within the scope of this Complaint.  Accordingly, Plaintiff reserves the right to include additional items identified through the course of discovery, including across brands.

[2] Business Wire, "P&G Acquires This is L., One of the Fastest Growing Feminine Care Brands in the U.S." (February 5, 2019), Available at https://www.businesswire.com/news/home/20190205005592/en/PG-Acquires-This-Is-L.-One-of-the-Fastest-Growing-Feminine-Care-Brands-in-the-U.S (last accessed February 21, 2023).

Organic Cotton Tampons" are "organic tampons," "natural," "clean and simple products," and provide "clean period protection."

5.    However, the Products are not natural, organic and clean, and they contain various synthetic ingredients and pose a material health risk to unsuspecting consumers.  The Products contain titanium dioxide ("TiO2"), antimony, and various other synthetic, non-natural, and non-organic ingredients such as polyester, glycerin, and paraffin—which render Defendants' marketing false, misleading, and deceptive.

6.    Unlike competitor products that make and fulfill clean promises in a non-misleading way, Defendants make their Clean Representations in a false and misleading way.

7.    Defendants affirmatively distract and confuse consumers with statements to further assure reasonable consumers like Plaintiff that she is purchasing a clean product.  In addition to Clean Representations concerning the "organic" and "natural" nature of the Products, other examples of such statements include "BPA-Free," "No Rayon," "No . . . Chlorine Bleaching," and "No . . . Synthetic Pesticides," and such statements are complemented by graphics of plants, the globe, and an equal sign in addition to pastel greens and blues.

8.    Defendants know of the harmful nature of their practices, but continue to deceptively market the Products to capitalize on consumers' desires.  Consumer perception confirms that Defendants have succeeded in misleading consumers to believe the Product is a safe and clean product.  A significant number of consumer comments on the websites of major retailers emphasize that the Product is "clean," "organic," and "natural."

9.    And Defendants have directly responded to such comments, only further affirming these reasonable views of consumers as to the Products.  For example, one consumer commented, "I like that they are organic and don't have any chemicals like other brands[.]"  The response from "This Is L. Inc." indicated "We appreciate the review!  We're committed to comfort and safety, so thank you for choosing L.!"

10.    Significantly, Defendants have also directly promoted reviews on their website to convince consumers that the Products provide clean period-care.  Specifically, Defendants specially feature eight specific reviews on the website.  These reviews describe Defendants' "clean"

marketing, as consumers comment about the purportedly organic tampons are better than other period-care options that "pump your body with chemicals." For example, one highlighted review states, "I was so excited to find a brand that is not only healthier because of being organic and no chemicals but also that does 1 for 1 and supports women in other ways as well."

11.     By deceiving consumers about the nature and quality of the Products, Defendants are able to affect the market for truly clean period care, to take away market share from competing products, to sell a greater volume of product, to charge higher prices for the Products, and to deny consumers the ability to use their purchasing dollars as they see fit. Plaintiff and the Class Members she seeks to represent were deceived into believing the Clean Representations. As a result, Plaintiff and Class Members have been injured in fact.

12.     Accordingly, Plaintiff brings her claims against Defendants individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq.; and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Fraudulent Omission or Concealment; (9) Fraudulent Misrepresentation; (10) Negligent Misrepresentation; (11) Quasi-Contract / Unjust Enrichment; and (12) Breach of Express Warranty.

## **PARTIES**

13.     Plaintiff Ashley Fountain is a natural person and citizen of California who resides in Vallejo, California. Ms. Fountain was interested in purchasing a clean period-care product that was organic, natural, and would not expose her to chemicals or otherwise harmful substances. Ms. Fountain specifically set out to purchase a product with these characteristics. Due to L. Organic's extensive efforts to create a context in the minds of reasonable consumers that it produces clean period-care that was organic, natural, and would not expose the user to chemicals or otherwise harmful substances, Ms. Fountain believed that L. Organic produced a product that met those characteristics.

14.     In or around May 2022, Ms. Fountain purchased L. Organic tampons from a brick-and-mortar Target in Vallejo, California.  Her belief in L. Organic's extensive marketing was complemented by L. Organic's on-label representations.    Prior to her purchase, Ms. Fountain reviewed the labeling, packaging, and marketing materials of the products and saw the false and misleading claims that, among other things, the Products are "organic," "BPA-Free," "No Rayon," "No . . . Chlorine Bleaching," and "No . . . Synthetic Pesticides."  Plaintiff also saw these statements complemented by graphics of plants, the globe, and an equal sign in addition to pastel greens and blues, which led her to believe that the Products were natural, organic, clean, and safe.

15.     Ms. Fountain understood these claims to be representations and warranties by Defendants that the Products were organic, clean, natural and did not raise a risk of exposure to synthetic ingredients, chemicals, or toxic substances.  She was not aware that the Product exposed her to chemical additives or toxic heavy metals.  Ms. Fountain reasonably relied on these representations and warranties—which were designed solely for the end-user—in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products or would not have purchased them on the same terms, if the true facts about its contents had been known.  As a direct result of Defendants' material misrepresentations and omissions, Ms. Fountain suffered, and continues to suffer, economic injuries.

16.     Ms. Fountain remains interested in purchasing clean menstrual products from Defendants that are safe for menstrual use.  However, Plaintiff is unable to determine if the Products are actually clean menstrual products that are safe for menstrual use and contain no synthetic, non-organic ingredients.  Plaintiff understands that the composition of the Products may change over time.  But as long as Defendants may market the Products as clean, natural, and safe for menstrual use when the Products are not, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' Products and competitors' Products.  Plaintiff is further likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to ensure that their marketing is accurate and non-misleading.

17.     Defendant P&G is a Delaware corporation with its principal place of business located in Cincinnati, Ohio.  Defendant has done substantial business throughout California and the United States at all times during the Class Period.  At all relevant times, Defendant has advertised, marketed, manufactured, distributed, and/or sold menstrual products, including the Products at issue, to consumers in and throughout California and the United States.  At all relevant times, Defendant, formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.  Defendant sold its Products into commerce with warranties designed solely for the benefit of the end-user.

18.     Defendant This is L. Inc. is a subsidiary of Defendant P&G and is a Delaware corporation with its principal place of business located in Cincinnati, Ohio.  Defendant describes itself as "At L. love starts with accessible period care, made with ingredients inspired by nature."

19.     Plaintiff reserves the right to amend this Complaint and add different products and additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendants.  This Court has personal jurisdiction over Defendants because they are licensed to do business in California, have designated an agent for services of process in California, and otherwise conduct substantial business in California.

21.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District and Plaintiff saw and heard Defendants' advertisements in this District.

**FACTUAL ALLEGATIONS**

A.     **Defendants' Menstrual Products**

23.     The Products are tampons that are inserted in the vaginal canal to absorb blood during a menstrual period.  The Product consists of a cylindrical pad housed in an applicator made of two tubes, an inner tube and outer tube, and a string.  When the Product is inserted, the user opens the folds of skin on the vagina and slides the outer tube housing the cylindrical pad inside the vagina, using the inner tube to push and release the absorbent material into the vagina.  The string is sewn all the way up to the cylindrical pad, so that the string will not break when it is pulled to remove the tampon.  Through normal use, the cylindrical pad may remain inside the vagina for hours, while the string remains against the labia or pushed inside the vagina.[3]  Indeed, Defendant P&G has explained, it is a common scenario for a tampon string to get pushed into the vagina.[4]

24.     Defendants operate under the name "L. Organic."

25.     The name has no other qualifiers and sends a concrete message to reasonable consumers like Plaintiff that the Product is a clean period-care product that is organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.

26.     For years, Defendants have positioned the Products unqualifiedly on their website as "[a]ward-winning organic products" that women can trust because they "deserve better."  Defendants stated "We believe that personal care products should leave you happy and healthy," marketed the

---

[3] Jen Anderson, "How to Insert and Remove a Tampon Correctly," Healthline (October 29, 2019), Available at https://www.healthline.com/health/how-to-insert-a-tampon#how-to-handle-the-string (last accessed February 21, 2023).

[4] In response to Plaintiff's allegations, Defendants sought to negate Plaintiff's allegations and newly claimed that TiO2 is only present on the string, directing the Court to the FAQ section of the This Is L website.  *See* Dkt. No. 9 at 4.  Plaintiff's counsel has verified through the Internet Archive that Defendants only added this bald claim on the website after Plaintiff purchased the Products, sent a demand letter, and filed her original complaint.  In any event, Defendants neglect to account for the actual design and use of the Products.

Products as having "[n]o ingredients you can't pronounce," and emphasized the offering of "[n]atural products for a natural process!"

27.     Defendants seek to mislead consumers to believe that the Products are a premium alternative to conventional tampons.  Yet, the Products present similar or more serious concerns as other tampons that do not make Clean Representations.

28.     Defendants know that their marketing confuses reasonable consumers about the nature of the Product's attributes, including its organic quality.  For example, Defendants market the Product as follows: "Organic tampons free of chlorine bleaching, pesticides, rayon, fragrances, or dyes."  Thus, in addition to the unqualified brand name of the Product, Defendants seize opportunities to mislead consumers to believe the tampons are "organic."  Defendants also emphasize that the Product provides "clean period protection with L. Organic Cotton Tampons."

29.     Similarly, Defendants know that they are misleading consumers into believing the Products are "natural products."  A Senior Manager of Defendants' Global Communications team directly referred to the Products as "high quality, natural products."

30.     Indeed, Defendants emphasize that message at every turn to cultivate brand awareness concerning the purportedly organic, clean, natural and safe nature of its tampons, including in its marketing, advertising, and directly on the Products' labels.

31.     For example, Defendants write directly on their website that "L." in the name "L. Organic" represents the following: "L. Is For Loving Your Body," "L. Is For Loving Your Budget," "L. Is For Lending A Hand," "L. Is For Loving Every Body," and "L. Is For Loving Every Community."

32.     Defendants write directly on their website that "Our tampons are made with organic cotton free from chlorine bleaching, pesticides, fragrances, and dyes with a BPA-free plastic applicator."

33.     Defendants write directly on their website that "our pads and liners are made with a cotton top layer free from chlorine, pesticides and fragrances."

34.     Defendants write directly on their website that "That's what we call period care inspired by nature designed with every body and every budget in mind."

35.     Defendants write directly on the websites of third-party retailers like Target, Kroger, and CVS that "L. is dedicated to the rebellious notion that women everywhere deserve better."

36.      In fact, L. Organic was founded by Talia Frenkel in 2011, a former photojournalist who worked with the United Nations and the Red Cross to document humanitarian crises around the world.

37.     And Defendant P&G recognized the importance of this messaging to the consumer segments when it acquired L. Organic, stating that "From our deep consumer research and understanding, we know that different consumers are seeking different product benefits.  Some we are currently meeting today with our Always and Tampax portfolio and others are looking for products like L.  This acquisition is exciting because it will help us to reach new consumers."

38.     Defendant P&G also remarked that "we can share . . . that we are focused on fueling the continued growth of L., and are committed to continue delivering the high quality, natural products that have earned the faith and trust of the L. consumer."

39.     And Defendants have continued that marketing ethos directly on the labels of the Products, with the unequivocal statement placed in bold font directly on the very front center of the packaging: "Organic Cotton Tampons," as set out in the image below:



40.     Defendants also place the statement "with BPA-Free Plastic Applicators[,] No Rayon, No Chlorine Bleaching Or Synthetic Pesticides," underneath that text, as set out in the image below:

///

///



41.     Defendants then complement these statements with images of a plant, globe, and equal sign, further assuring reasonable consumers that the Products are safe and clean with natural ingredients, having a positive impact on the globe and people.



42.     These messages continue on the reverse of the Products.  At the very top of the back packaging, Defendants write that "L. Is For Love," as set out below:



43.     Defendants then include additional representations and icons directly at the top of the packaging, as set out below:

44.     These additional icons inform consumers that the Products they are purchasing are manufactured by a "Certified B Corporation" and that the Products are "Organic Certified," further assuring consumers that the Products are clean period-care product that is organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.

45.     These icons are then complemented by a paragraph of text consistent with the rest of Defendants' on-label marketing:

///

///



46.     Defendants' messaging uses words like "period care," "accessible," "supporting," "health education," "collective action," "lasting change," and, again, "Love begins with L."

47.     That paragraph of text is then complemented by images of women holding hands as well as one another's shoulders, giving reasonable consumers the impression that they are purchasing a product from a company that cares about their well-being.



48.     Then, as if to close the marketing production, Defendants place a large, prominent black banner under the image of the women set out above, with the following message:



49.     This message further assures reasonable consumers like Plaintiff that her purchase is an investment in a good company that cares about her well-being, and which makes products reflective of that value.

50.     Only after all of that, Defendants set out in much fainter, horizontal font that is hard to read due to the colors in the background and the vertical font from the individual packaging of the tampons, the ingredient list.  What's more, the ingredient list provides descriptions of the ingredients,

as if to assure reasonable consumers—if they even happen to notice the list—that there is no harm from the various ingredients.

| Ingredients | ...description |
|---|---|
| Cotton | ...organic cotton |
| Polyester | ...fiber that wicks away moisture |
| Glycerin | ...coating for smooth feeling |
| Paraffin | ...wax for smooth feeling |
| Titanium Dioxide | ...makes material look white, naturally occurring |

51.    For example, Defendants state in italic font that the polyester is a "fiber that wicks away moisture" and the glycerin is a "coating for smooth feeling."

52.    Defendants even state that titanium dioxide is "naturally occurring," as if the ingredient is healthy, safe for menstrual use, and raising no risk of exposure to synthetically derived, non-organic ingredients, including substances that raise risk of harm from bioaccumulation.

53.    Those statements only serve to confuse and mislead consumers. Noticeably, Defendants make no effort to reconcile the existence of these synthetic, non-organic ingredients with the prominent "Organic" representations made directly on the front of the Products' packaging.

 

54.    Before Plaintiff Fountain purchased the Product, she picked up the Product, held it in her hand, and reviewed the labeling materials discussed above. Plaintiff believed based on the

brand's name and the other Product claims that the Product was clean period-care product that is organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.

55.     However, Plaintiff and other reasonable consumers were misled.

56.     The following provides a sampling of consumer comments that emphasize that the Products are "organic," "natural," and "clean."

- "They have convenient easy-open packaging and a comfortable applicator.  Best of all, you feel good about what you are putting in your body since they are 100% organic and free of chemicals."

- "I like that they are organic and I do not have to worry about any added chemicals."

- "This organic tampon is made of natural cotton and I don't have to worry about extra dyes or chemicals."

- "I love that these are organic and made from natural products, they are sleek and easy to use as well."

- "Really like that they are organic and don't contain any extra chemicals."

- "The clean organic products used to make them gives me peace of mind when using them is such a sensitive area."

- "It can be hard to find tampons that are both 100% organic and chemical free and that also provide ultimate comfort and protection.  These do all of the above."

- "I love organic product it's so much better for our body's then all of the chemical filled things we wouldn't even think have on of in them!"

-  "I generally use a menstrual cup, but I like to have tampons on hand just in case. These tampons are great. I feel much more comfortable using them knowing they don't have a bunch of harmful chemicals in them."

- "They are organic, sustainable, chemical- and scent-free, and they WORK."

- "These hold so much and the fact that they are natural is a plus."

- "I like that the Tampons are 100% organic."

- "I love that these are organic.  They are comfortable and feel like many other mainstream brands.  I am happy to know that I am using a safer product."
- "I love that they are organic and use clean ingredients."
- "Anything that is free of chemicals and nasty stuff is amazing and these are just that amazing."
- "Organic is the safest option!!!!!!"
- "Ladies listen to me you have to give these absolutely awesome Total protection, This is L-L. Full Size Regular/Super Tampons a try I promise you will love them I do they are natural they are a healthy choice for your delicate system give them a try you will not be disappointed and protection like you would not believe I love them they are certainly at the top of my list."
- "Love that This is L, regular/super tampon combo is all organic.  These are very absorbent and leak proof.  These are easy to use, and again Love that it is all organic."
- "I have struggled for years trying to find tampons that are good for you, organic, climate conscious and comfortable. Is so hard nowadays with so many choices and misinformation out there. So glad I found these."
- "I feel very comfortable using it as it is made clean and can be trusted with health wise."
- "Wonderful and natural tampons without the added chemicals."
- "I was trying to be more conscience of what products I used on or in my body so I decided to give the L. Full Size Regular Tampons a try. They worked great. No leaking, easy to use and most important, 100% organic."
- "These tampons are great and organic!"
- "This was my first time trying L. Organic tampons and I love the story behind this particular brand and everything it stands for!  This product is for women and made by women so you know it's a quality product.  The fact that it's organic makes me feel better about what I'm putting in my body."

- "L. Is my preferred brand when it comes to feminine hygiene products. The packaging is beautiful and appealing but also the products are clean."
- "I'm trying to be more careful with what I put in my body, so putting something natural in one of the most sensitive parts of my body is essential."
- "I love, love, love organic tampons and these do not disappoint!! I feel so much better about not putting something filled with chemicals inside of me."
- "I love the fact that these are organic.  They hold a lot of liquid which I feel is the best part.  The fact that it is just cotton makes it that much better since there are no additives."
- "There is no fragrance & they are all natural."
- "I love the natural of it all but they need to be longer I brought the extra long and it was too small...and the pad didn't stick to none of the different under...I kept moving...again I love how natural they are but need to be made better for us bigger gals"
- "This organic tampon is made of natural cotton and I don't have to worry about extra dyes or chemicals."
- "I love that these are 100% organic tampons.  I can feel good about putting something into my body that will not cause any harm to me."
- "I like that they are all natural, without chemicals."
- "From a women's perspective I personally feel even better knowing that when I'm using these tampons I'm not inserting chemicals into my body and the fact that they work great is just the icing on the cake!"
- "Organic. Finally, products are being designed for the unique health needs of women!"

**B.    The Vagina and Vaginal Health**

57.    The vast majority of women in the United States use tampons, including up to 86% of women.  Vaginal exposure to substances raises important health concerns, in large part due to the nature of vaginal absorption.

58.     According to expert Alexandra Scranton, "vaginal or vulva tissue [is] much different and more sensitive than the skin on the rest of [the] body."[5]

59.     "The walls of the vagina are filed with numerous blood vessels and lymphatic vessels which allow for direct transfer of chemicals into the circulatory system."

60.     "Chemicals absorbed through the vagina are easily and effectively distributed throughout the body, without being metabolized."

61.     Indeed, according to Jessica Singh of Columbia University's Mailman School of Public Health, "[t]he vagina is an effective delivery route of drugs to the systemic circulation, suggesting that it could also effectively deliver other compounds like toxic chemicals, to the circulation."[6]

62.     "This is due to the abundance of arteries, blood and lymphatic vessels in the walls of the vagina mucosa, and the fact that absorption through this route bypasses first-pass metabolism, by directly entering the peripheral circulation."

63.     "For instance, vaginal administration of estradiol results in significantly higher blood serum levels compared to oral administration.  Furthermore, vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body, which may make these more susceptible to chemical exposure."

64.     "Moreover, in addition to systemic exposure, vaginal exposure to chemicals and drugs can also have local effects on vaginal and cervical tissue."

65.     "Therefore, if tampons do contain harmful chemicals, tampon use may be a potentially important source of these chemicals via the vaginal route given the rapid absorption that occurs in the vagina and the cumulative exposure to tampons over a woman's reproductive life and may also affect the epithelial integrity of vaginal and cervical cells, potentially increasing susceptibility to sexually transmitted infections."

---

[5] Alexandra Scranton, *Chem Fatal: Potential Health Effects of Toxic Chemicals in Feminine Care Products* 9 (2013).

[6] Jessica Singh, et al., "Tampon Use, Environmental Chemicals and Oxidative Stress in the BioCycle Study," 18:11 *Env. Health* 1-9, 2 (2019).

**C.**     **Titanium Dioxide and Antimony**

66.     Titanium dioxide or TiO2—which is used in paints, coatings, adhesives, plastics, printing inks, and roofing materials—has demonstrated an ability to pass through biological membranes, circulate through the body, and enter cells.  Research shows that the effects are serious, including DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, and cell neurosis.

67.     TiO2 also builds up in the body's intestinal tract.  Ordinarily, the intestinal track serves to absorb nutrients for the body.  However, titanium dioxide cannot be absorbed.  When this occurs, the body's M-Cells absorb these particles and bring them to the innate immune system.  Overtime, the titanium dioxide particles are incorporated by the innate immune system cells where they will remain without being degraded or dissolved.

68.     The European Parliament has banned TiO2 as an additive.  Defendants, who operate offices and conduct substantial business in Europe, would have been aware of that ban and the problems presented by TiO2 when ingested or absorbed by the human body.

69.     According to Plaintiff's expert, the unique characteristics of vaginal tissues raise particular concern regarding vaginal uptake of TiO2 specifically.

70.     Indeed, there is a significant risk of higher TiO2 vaginal uptake, as compared to other epithelial cell systems.   Importantly, TiO2 is a hydrophilic material.   And the hydrophilic environment of the vagina is particularly conducive to a hydrophilic material such as TiO2.

71.     Additionally, the surface of the vaginal epithelium does not have a protective lipid layer, but instead contain areas where TiO2 particles can readily penetrate.

72.     It is for this reason that the vagina is an advantageous site for drug delivery, meaning that TiO2 particles can be absorbed by the same pathways, then entering the blood stream or diffusing into lymphatic capillaries.

73.     Regardless of the mode of entry, particles will migrate beyond vaginal cells to various major organs.

74.     Among others, sites for TiO2 bioaccumulation include the lungs, brain, spleen, kidneys, and liver.

75.     Acknowledging that TiO2 is used in various products, Dr. Philip M. Tierno, Jr., a professor of microbiology and pathology at the NYU School of Medicine, nonetheless indicated that the use of TiO2 in tampons is a problem, given the risk of absorption into the bloodstream.

76.     Dr. Tierno also indicated that tampons that are marketed as organic should not contain TiO2.  And the same is true as to tampons containing antimony, a heavy metal that can be absorbed through epithelial tissue.

77.     Testing commissioned by Plaintiff's counsel and conducted at Galbraith Laboratories indicated an inordinately high amount of antimony in the tampons.  Specifically, the laboratory results demonstrated that the Products expose consumers to approximately 2,614 parts per billion ("pbb") of antimony.

78.     Antimony is one of the most toxic of the heavy metals.  Following inhalation, oral, or dermal exposure to antimony, adverse health effects have been observed in both humans and animals.

79.     The unnecessary addition of both antimony and TiO2 is concerning because of the highly absorbent nature of the vagina.

**D.     Defendants' Misrepresentations and Omissions are Actionable**

80.     Defendants have endangered U.S. consumers, exposing them to antimony and TiO2, which Defendants know carry significant health concerns.  Defendants have also misrepresented the Products as "organic" and "natural" despite the existence of non-natural and non-organic ingredients such as polyester, glycerin, and paraffin.

81.     As a result, Plaintiff and the Class were injured and paid a price premium (up to the full price).

82.     Plaintiff and Class Members bargained for products that present clean period-care that is organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure and were deprived of the basis of their bargain when Defendants sold them Products containing ingredients that are not natural or organic and that are not safe for menstrual use.

83.     No reasonable consumer would expect that the Products marketed as organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure would

contain various synthetic ingredients, chemical additives, and heavy metals.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

84.     As the Products expose consumers to a substance that pose a risk to consumers' health, the Products are not fit for menstrual use.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to TiO2 and antimony, damages related to Defendants' conduct, and injunctive relief.

85.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendants were under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects.   Nonetheless, Defendants concealed and misrepresented this information, as discussed herein.

86.     Although Defendants are in the best position to know what content it placed on their packaging during the relevant timeframe, and the knowledge that Defendants had regarding the presence of TiO2 and antimony, and its failure to tell consumers that the Products contained TiO2 and antimony and other synthetic ingredients, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

87.     **WHO**:  Defendants made material misrepresentations and omissions of fact about the Products through its labeling which shows that the "clean period-care" Products are organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.  These representations constitute omitted material information regarding harmful substances.

88.     **WHAT**:  Defendants' conduct here was, and continues to be, fraudulent because it misrepresented and omitted that the Products contain substances—TiO2 and antimony—that are widely known to have significant health repercussions, and otherwise that the Products are natural and organic.  Thus, Defendants' conduct deceived Plaintiff and Class Members into believing that the Products are safe for human consumption when they are not.  Defendants knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner in the U.S. market.

89.   **WHEN**:  Defendants made material misrepresentations and omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite their knowledge that the Products' packaging contained TiO2 and antimony, harmful substances with known adverse health effects, and otherwise, that the Products were not natural or organic.

90.   **WHERE**:  Defendants' marketing message was uniform and pervasive, carried through material misrepresentations and omissions on the labeling of the Product's packaging, website, and through marketing materials.

91.   **HOW**:  Defendants made material misrepresentations and omissions of fact regarding the Products, including the presence of TiO2 and antimony in the Products, and otherwise that the Products were natural and organic.

92.   **WHY**:  Defendants made the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendants profited by selling the Products to hundreds of thousands of consumers.

93.   **INJURY**:  Plaintiff and Class Members purchased, paid a premium (up to the full-price), or otherwise paid more for the Products when they otherwise would not have absent Defendant's omissions.

**TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS**

94.   Defendants have had actual knowledge for years that the Product contains harmful substances and, otherwise, that the Products are not natural or organic.

95.   Although Defendants were aware of the deception in their labeling given the inclusion of polyester, glycerin, paraffin, antimony, and titanium dioxide in the Products despite claims of the Products' composition and safety, they took no steps to warn Plaintiff or Class Members of risks related to antimony and TiO2 in the Products.

96.   Despite their knowledge, Defendants have fraudulently misrepresented and omitted the risks of the Products.  Defendants had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

97.     Defendants made, and continue to make, affirmative misrepresentations and omissions to consumers, to promote sales of the Products.

98.     Defendants concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products.  Defendants' concealment was knowing, and they intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.     Accordingly, Plaintiff and Class Members reasonably relied upon Defendants' concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

99.     The antimony and TiO2 included in the formulation, design and/or manufacture of the Products were not reasonably detectible to Plaintiff and Class Members for the reasons outlined above.

100.     At all times, Defendants actively and intentionally concealed the existence of the antimony and TiO2 and failed to inform Plaintiff or Class Members of the existence of antimony and TiO2, or that the Product contained synthetic, non-organic ingredients.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

101.     Defendants' statements, words, and acts were made for the purpose of suppressing the truth that the Products contained harmful substances and synthetic substances.

102.     Defendants concealed or misrepresented the presence of antimony and TiO2, as well as the non-natural nature of the Product, for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

103.     As a result of Defendants' active concealment and/or failure to inform Plaintiff and Class Members of the composition and the true non-natural nature of the Product, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendants are estopped from relying on any statute of limitations in light of their active concealment of the harmful nature of the Products.

104.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained antimony and TiO2, which, at the very earliest, would have been July 2022.  Plaintiff and Class Members had no realistic ability to discern that the

Products contained antimony and TiO2 and were hampered in their ability to discover their causes of action because of Defendants' active concealment and misrepresentations, as well as the Products' true nature.

## CLASS ALLEGATIONS

105. ***Class Definition.***     Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgement in this action, purchased any of Defendants' Products at issue (the "Class")

(a)     ***California Subclass.*** Plaintiff Ashley Fountain also seeks to represent a subclass of all Class members who within the applicable statutes of limitations period, up to and including the date of final judgement in this action, purchased any of the Products at issue in California (the "California Subclass").

106.   Excluded from the Class and Subclasses are persons who made such purchase for purpose of resale, Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

107.   Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

108.   ***Numerosity.***   Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined though discovery.  Class members may be notified of the pendency of this action by mail and/or publications through the distribution records of Defendants and third-party retailers and vendors.

109.   ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include but are not limited to: whether Defendants warranted the Products

through its Clean Representations; whether Defendants breached these warranties; and whether Defendants committed the statutory and common law violations alleged against them herein by doing so.

110.   **Typicality.**   The claims of the named Plaintiff is typical of the claims of the Class in that Plaintiff purchased one of Defendants' Products in reliance on the representations and warranties described above and suffered a loss as a result of that purchase.

111.   **Adequacy.**   Plaintiff is an adequate representative of the Class and respective Subclass because her interest does not conflict with the interests of the Class and Subclass members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class and Subclass members will be fairly and adequately protected by Plaintiff and her counsel.

112.   **Superiority.**   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class members may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense of all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issue will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

113.   Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

114.   Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of its wrongdoing.

115.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## COUNT I
### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

116.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

117.     Plaintiff bring this claim individually and on behalf of the Class against Defendants under California law.

118.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

119.     By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class, by engaging in unlawful, fraudulent, and unfair conduct.

120.     Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

121.     As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, inter alia, making the misrepresentations and omissions of material facts, as set forth more fully herein, and violating the common law.

122.     Plaintiff and the Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

123.     Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends

public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

124.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

125.    Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendants' claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

126.    Plaintiff and the other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

127.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

128.    Plaintiff and the other Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

129.    The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Class Members.

130.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and Class members' attorneys' fees and costs.

131.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium

price of the Products, Plaintiff would be left without the parity in purchasing power to which she is entitled.

132.    Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' representations as well of those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

133.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) correcting the deceptive marketing described above, including but not limited to adequate disclosure of antimony and $TiO_2$ in the Product and its effects; or (2) the removal of such substances from the Product, will ensure that Plaintiff is in the same place she would have been in had Defendants' wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Products absent misrepresentations and omissions with the full purchase price or price premium at her disposal.

## COUNT II
### (Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)
### (Injunctive Relief Only)

134.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

135.    Plaintiff brings this claim individually and on behalf of the Class against Defendants under California law.

136.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

137.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

138.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

139.    Defendants violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as natural, organic, and safe for menstrual use, when in fact the Products are not natural, organic, and safe for menstrual use.

140.    Defendants have exclusive or superior knowledge of the Products' composition and the associated health concerns, which was not known to Plaintiff or Class Members.

141.    Plaintiff and Class Members have suffered harm as a result of these violations of the CLRA because she has incurred charges and/or paid monies for the Products that she otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

142.    On August 10, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  On November 10, 2022, Plaintiff's counsel sent Defendants a second letter.  The letters were sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendants failed to remedy the issues raised in the notice letters. Accordingly, the California Plaintiff seeks damages from Defendants for their violations of the CLRA.

143.    Injunctive relief is appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' representations as well of those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

## **COUNT III**
### **(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

144.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

145.    Plaintiff brings this claim individually and on behalf of the Class against Defendants under California law.

146.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

147.    The Song Beverly Act does not require privity.  Moreover, California has codified the third-party beneficiary exception to any privity requirement.   Therefore, Plaintiff need not demonstrate vertical privity because she is a third-party beneficiary to Defendants' contracts with wholesalers or retail sellers and relied on Defendants' packaging in making her purchase.  Plaintiff and members of the Class are third-party beneficiaries because the extinguishers passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.  Plaintiff believes that discovery will demonstrate, for example, that Defendant's Supplier Agreements to wholesalers and retailers provides for warranties designed for the end-user.

148.    The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

149.    Plaintiff and the Class Members who purchased the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791, and a third-party beneficiary of the end-user warranties consistent with California law.

150.    Defendants are in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are "manufacturer[s]" and "seller[s]" within the meaning of Cal. Civ. Code § 1791.

151.    Defendants impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  For a

consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendants breached these implied warranties because the Products were not natural, organic, or safe for menstrual use.  Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

152.    Plaintiff and Class Members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging and labeling the Products.

153.    The Products were not altered by Plaintiff or the Class Members.

154.    The Products were defective at the time of sale when they were in the exclusive control of Defendants.  The issues as described in this complaint were latent in the product and not reasonably discoverable at the time of sale.

155.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

156.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were not organic, natural, and free of synthetic ingredients and other substances that raise risk of harmful exposure.

157.    Plaintiff and the Class seek compensatory damages, attorneys' fees, costs, and any other just and proper relief available under law.

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.*)**

158.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

159.    Plaintiff brings this claim individually and on behalf of Class against Defendants under California law.

160.    Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendants misrepresented the Products through its Clean Representations.

161.   By their actions, Defendants disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

162.   The above-described false, misleading, and deceptive advertising Defendants disseminated continue to have a likelihood to deceive in that Defendants failed to disclose that the Products contain synthetic, non-organic substances, as well as harmful ingredients that pose a significant risk to the health and well-being of Plaintiff and the Class Members.

163.   Defendants continue to misrepresent to consumers that the Products are natural, organic, and safe for menstrual use.  However, as described, that is not the case.

164.   In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class Members based their purchasing decisions on Defendants' misrepresentation and omission of material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class Members were injured in fact and lost money and property as a result.

165.   The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

166.   As a result of Defendants' wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

167.   Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

168.   Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from their purchase of the Products is determined to be an

amount less than the premium price of the Products.  Without compensation for the premium price of the Products, Plaintiff would be left without the parity in purchasing power to which she is entitled.

169.   Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' representations as well of those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

170.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the non-natural and non-organic ingredients as well as that the Products are not fit for menstrual use; or (2) the removal of such ingredients from the Products, will ensure that Plaintiff is in the same place she would have been in had Defendants' wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at her disposal.

## COUNT V
### (Fraud)

171.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

172.   Plaintiff brings this claim individually and on behalf of the Class under California law.

173.   At the time Plaintiff and Class Members purchased the Products, Defendants did not disclose, but instead concealed and misrepresented, the Products as safe, natural, organic, and fit for menstrual use.

174.   Defendants also knew that their omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' omissions and misrepresentations in making purchasing decisions.

175.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

176.   Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations and omissions in making their purchasing decisions.

177.     Plaintiff and Class Members had a right to rely upon Defendants' misrepresentations and omissions as Defendant maintained monopolistic control over knowledge of the true nature and quality of the Products.

178.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' misrepresentations and omissions, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## <u>COUNT VI</u>
### (Constructive Fraud)

179.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

180.     Plaintiff brings this claim individually and on behalf of the Class under California law.

181.     At the time Plaintiff and Class Members purchased the Products, Defendants did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

182.     Defendants affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed natural, organic, and safe for menstrual use.

183.     Defendants also knew that their omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon their representations (and corresponding omissions) in making purchasing decisions.

184.     Defendants had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiff and the Class Members relied upon Defendants to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendants' representations and omissions, and were reasonable in doing so, with the full knowledge of Defendants that it did and would have been reasonable in doing so.

185.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

186.    Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

187.    Plaintiff and Class Members had a right to rely upon Defendants' representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendants maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Products.

188.    Defendants breached their duty to Plaintiff and Class Members to make full disclosures of the safety of their Products.

189.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, and Defendants' breach of their duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

190.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

191.    Plaintiff brings this claim individually and on behalf of the Class under California law.

192.    Defendants did not disclose, but instead concealed and misrepresented material information about the Products as discussed herein.

193.    Defendants knew, or should have known, that the Products were falsely and misleadingly portrayed and that knowledge of the safety-related issues, as well as the true nature of the Products discussed throughout, was withheld from the consumer public.

194.    Defendants also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely on Defendants' omissions in making purchasing decisions.

195.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Products.

196.    Plaintiff and Class Members would have been reasonable in relying on Defendants' omissions in making their purchasing decisions.

197.    Plaintiff and Class Members had a right to rely on Defendants' omissions as Defendants maintained monopolistic / superior control over the Products, and what information was available regarding the Products.

198.    Defendants intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Products based upon its omissions.

199.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omission, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

**COUNT VIII**
**(Fraudulent Concealment or Omission)**

200.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

201.    Plaintiff brings this claim individually and on behalf of the Class under California law.

202.    At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling the Products.

203.    Defendants, acting through their representatives or agents, delivered the Products to their distributors and various other distribution channels.

204.    Defendants willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

205.    Rather than inform consumers of the truth regarding the Products, Defendants misrepresented the quality of the Products as discussed herein at the time of purchase.

206.    Defendants made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendants are reputable companies and that their Products are safe for use.  The false representations were material to consumers because the omissions played a significant role in the value of the Products purchased.

207.    Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiff and Class Members had no way of knowing

Defendants' omissions as to the Products and had no way of knowing that Defendants' omissions were misleading.

208.    Although Defendants had a duty to ensure the safety, completeness, and accuracy of the information regarding the Products, they did not fulfill these duties.

209.    Defendants omitted or concealed material facts partly to pad and protect their profits, as they saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products.  Such benefits came at the expense of Plaintiff and Class Members.

210.    Plaintiff and Class Members were unaware of these material omissions, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Defendants' omissions.  Defendants were in the exclusive / superior control of material facts, and such facts were not widely known to the public.

211.    Due to Defendants' misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Products that did not live up to its advertised representations.  Plaintiff and Class Members are entitled to recover full refunds for the Products they purchased due to Defendants' omissions.

212.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's, and Class Members' rights and well-being, and in part to enrich themselves at the expense of consumers.  Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT IX
### (Fraudulent Misrepresentation)

213.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

214.    Plaintiff brings this claim individually and on behalf of the Class under California law.

215.     Defendants falsely represented to Plaintiff and the Class that the Products were natural, organic, and safe for menstrual use.

216.     Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

217.     Defendants knew or should have known that their Clean Representations about the Products were false and misleading as discussed throughout.  Defendants knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

218.     Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendants advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Class's reliance on Defendants' misrepresentations was justifiable.

219.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Products and that they does not conform to the Products' labels, packaging, advertising, and statements.

220.     Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT X
### (Negligent Misrepresentation)

221.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

222.     Plaintiff brings this claim individually and on behalf of the Class under California law.

223.     Defendants had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

224.     Defendants breached their duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiff and the Class

that did not have the qualities, characteristics, and suitability for use as advertised by Defendants and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

225.    Defendants knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants.  Specifically, Defendants knew or should have known that the Products were not natural, organic, or safe for menstrual use.

226.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known the true nature and characteristics of the Products and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.

227.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

### COUNT XI
**(Quasi-Contract / Unjust Enrichment)**

228.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

229.    Plaintiff brings this claim individually and on behalf of the Class under California law.

230.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

231.    Plaintiff and Class Members conferred benefits on Defendants by purchasing the Products.

232.    Defendants were unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented and failed to disclose that the Products were unfit for their intended purpose as they were not natural, organic, or free of substances that raise risk of harmful exposure.  These omissions and misrepresentations caused

1   injuries to Plaintiff and Class Members because they would not have purchased the Products if the

2   true facts were known.

3        233.    Because Defendants' retention of the non-gratuitous benefits conferred on them by

4   Plaintiff and Class Members is unjust and inequitable, Defendants have been unjustly enriched in an

5   amount to be determined at trial.

6        234.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at

7   law, if, for instance damages resulting from his purchase of the Products is determined to be an

8   amount less than the premium price of the Products.  Without compensation for the full premium

9   price of the Products, Plaintiff would be left without the parity in purchasing power to which she is

10  entitled.

11       235.    Restitution may also be more certain, prompt, and efficient than other legal remedies

12  requested herein.  The return of the premium price will ensure that Plaintiff is in the same place she

13  would have been in had Defendants' wrongful conduct not occurred, i.e., the position to make an

14  informed decision about the purchase of the Products absent omissions and misrepresentations with

15  the full purchase price at his disposal.

16  **COUNT XII**<br>**(Breach of Express Warranty)**

17       236.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

18       237.    Plaintiff brings this claim individually and on behalf of the Class under California

19  law.

20       238.    Plaintiff and Class Members formed a contract with Defendants at the time Plaintiff

21  and Class Members purchased the Product.

22       239.    The terms of the contract include the promises and affirmations of fact made by

23  Defendants on the Products' packaging and through marketing and advertising, as described above.

24       240.    This labeling, marketing, and advertising constitute express warranties and became

25  part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class

26  Members.

27

28

241.    As set forth above, Defendants purport through their advertising, labeling, marketing, and packaging, to create an express warranty that the Product conformed to the Clean Representations.

242.    Plaintiff and Class Members performed all conditions precedent to Defendants' liability under this contract when they purchased the Products.

243.    Defendants breached express warranties about the Products and their qualities because despite Defendants' warranties concerning the Clean Representations, the Product is objectively not in fact clean, natural, organic, or free of harmful substances.  Thus, the Products did not confirm to Defendants' affirmations and promises described above.

244.    Plaintiff and each Class Member would not have purchased the Products had they known the true nature of the Products.

245.    As a result of Defendants' breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

246.    On August 10, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a notice apprising Defendants of their breach of express warranties.  That letter complied in all respects with U.C.C. §§ 2-313, 2-314, and 2607.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks Judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper;

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  February 21, 2023         **BURSOR & FISHER, P.A**.

By:   _/s/  Elvia M. Lopez_
         Elvia M. Lopez

L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
Elvia M. Lopez (State Bar No. 331986)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
       slitteral@bursor.com
       elopez@bursor.com

*Attorneys for Plaintiff*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Elvia M. Lopez, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., counsel of record for Ashley Fountain.  Plaintiff Fountain resides in Vallejo, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California, as Plaintiff purchased the Product from a retail store located within this District.  Additionally, Defendants advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 21st day of February, 2023.


　*/s/ Elvia M. Lopez*　
Elvia M. Lopez